497 F.2d 67
 Roy C. WILLIAMS, Plaintiff-Appellant-Cross Appellee,
v.
BRASEA, INC., and VESSEL CLAPESC I, her engines, etc.,
Defendants-Appellees-Cross Appellants, Bender Welding &
Machine Co., Inc., Defendant-Appellee-Cross Appellant,
Construction Machinery Company, Defendant-Appellee-Cross Appellant.
 No. 72-3623.
 United States Court of Appeals, Fifth Circuit.
 July 5, 1974.
 
 M. W. Meridith, Jr., Corpus Christi, Tex., for Const. Mach. Co.
 C. D. Kennedy, William M. Jensen, Houston, Tex., Jack G. Carinhas, Jr., Brownsville, Tex., for Brasea.
 A. J. Watkins, Bill R. Bludworth, Houston, Tex., for Bender.
 William R. Edwards, Corpus Christi, Tex., W. A. Cleveland, Jr., Jacksonville, Fla., for Williams.
 Before GEWIN, THORNBERRY and SIMPSON, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 The shrimp trawler CIAPESC I, out of Freeport, Texas was trawling for shrimp in the Gulf of Mexico, when the events leading to this involved lawsuit took place. Roy C. Williams, the plaintiff below and appellant (and cross-appellee) here, was master of the CIAPESC I at the time he was seriously injured aboard the vessel. Williams prevailed below in this action against the owner of the vessel, Brasea, Inc. (Brasea), its builder, Bender Welding and Machine Company, Inc. (Bender), and the designer-manufacturer Construction Machinery Company (CMC), of the winch assembly involved in the accident. As to Brasea the action was premised upon unseaworthiness of the CIAPESC I and negligence under the Jones Act, Title 46, U.S.C. Sec. 688. Bender and CMC were sued on theories of negligence and products liability. Brasea cross-claimed for a right of indemnity as against Bender and CMC, and Bender cross-claimed for indemnity from CMC.
 
 
 2
 The several claims and cross-claims were tried together to the district court without a jury. Final judgment was entered for Williams in the sum of $316,500, which was reduced from a finding of damages in the amount of $527,500, by 40% ($211,000.00), the proportion of damages the court found to represent Williams' contributory negligence. Liability was found as to Brasea based on the negligence of employee Terry, a crewman aboard the vessel, and unseaworthiness of the CIAPESC I. Bender and CMC were found liable on the theory of products liability set forth in the Restatement of Torts 2d, Sec. 402A. Both Bender and CMC were further found not to have been negligent, and both cross-claims for indemnity were denied. By amendment to the final judgment, the liability found was changed from joint and several against the defendants to primary-secondary. Williams gave timely notice of appeal and all defendants filed cross-appeals. After review of the briefs, record, and argument we remand for further findings in connection with the negligence issues and reverse on the issue of products liability.
 
 I FACTS
 
 3
 On December 10, 1969, the CIAPESC I was trawling for shrimp in the Gulf of Mexico off the Texas coast. Aboard were Williams, master of the vessel, and two crewman, Edward Terry and Jeremiah Richo. The accident involved a power winch designed and manufactured by CMC and installed by Bender during the ship's construction. The winch had three drums which revolved when power was supplied to the winch. Two machined steel winch heads, called 'catheads', were attached to and extended from the drums. Catheads resemble large empty spools perhaps a foot high and of somewhat smaller diameter. Their function largely is to assist in pulling 'whiplines', a whipline being a line attached to a shrimp net and run thence through a block and tackle down to the deck of the ship from the Aframe boom which supports it. By wrapping the loose end of the whipline around the cathead and engaging the power, a crewman uses the rotation of the cathead to pull the net alongside the vessel and from there out of the water and up to the deck.
 
 
 4
 There were two catheads on board the CIAPESC I. A push-pull handle for engaging the power to the winch, and thus the catheads, was located between the two. A low platform on which to stand in front of the handle facilitated reaching it. On the day in question, with both port and starboard nets out, in the 25-fathom area, they hit a 'bad bottom' and Williams, the master, ordered the crew to pick up the nets. As the port net was being retrieved the whipline running from the net through the snatch block to and around the cathead became tangled around the cathead. Terry cut the power to the cathead and Williams, who had been below, came on deck to see what had happened. Recognizing the problem, he instructed Terry to pull on the line in order to create some slack. Williams then began untangling the line around the cathead with his hands.
 
 
 5
 From all the testimony it appears that, at this precise moment, Terry was standing on the platform in front of the on-off power handle, between the two catheads. Williams was on the other side of the cathead on which the line was tangled, perhaps two feet away. Richo was about six feet away, but was not watching Terry or Williams. A factual dispute exists with respect to what immediately ensued. Terry testified that Williams ordered him to cut on the power of the winch and he did so. Williams denied giving any such order. Richo did not hear anything, but that fact is by no means conclusive, becase he was not paying attention and because extraneous noises existed at the time.
 
 
 6
 When the power came on the cathead began to turn and the line quickly became taut. Williams' left hand caught in the line on the cathead and he yelled for Terry to take it out of gear. The cathead continued to turn for three or four revolutions after it was disengaged, as do all catheads mounted on winches that lack a brake. While trying to free himself, Williams caught his right hand in the line on the cathead and this arm was pulled further into it. He was cut loose after having been carried over the cathead several times thus entangled. The resulting injuries required the amputation of both of Williams' arms. There was further conflict in the evidence as to who actually turned the power off and whether it was before or after Rich0 freed Williams by cutting the line. Terry further testified that he looked at Williams just before he was ordered to turn on the power and, while he could not see his hands, he seemed to be in the clear.
 
 II APPEAL BY WILLIAMS
 
 7
 Williams appeals from several aspects of the court's final judgment. Most significant in his attack on the 40% Reduction of the judgment because of his asserted contributory negligence. He first urges that he was not in fact contributorily negligent, and second that, even if he were, the court made no factual findings to support its 40% Comparative negligence figure. In our view the question of Williams' contributory negligence vel non is inextricably tied to the issue of (a) Terry's, and (b) hence Brasea's,[1] negligence. We deal first therefore with the competing negligence claims of Williams and Brasea.
 
 
 8
 The district court's memorandumopinion and order contains two references to the dispute as to whether Williams ordered Terry to engage the power and its relevance to liability. The court initially stated that 'whether plaintiff told him to do so or not, when Terry turned on the power without making a reasonable effort to be sure plaintiff was clear of danger, he was negligent, . . .' App. at 1746. Later in its opinion the court observed that 'the Court is not prepared to find that Plaintiff gave Terry specific instructions to turn on the power, . . .' App. at 1758. The lower court clearly reasoned that Terry was negligent in turning on the power even if he was ordered by Williams to do so.
 
 
 9
 Williams' contributory negligence was put on a different footing. There was testimony regarding alternative methods Williams might have used in an effort to untangle the line around the cathead, such as prying it loose with a Stillson wrench or simply cutting it with a knife. This was perhaps the basis of the district judge's 40% Comparative negligence figure, since in his reference to the reduction he stated that 'he took the hard way, a dangerous way, in trying to untangle the rope . . . he disregarded the existing danger, when, if careful, he could have avoided being caught by the tangled rope, when the rod was pushed in'. App. at 1757.
 
 
 10
 We determine that the present findings of fact in the record will not support the trial court's legal conclusions as to negligence and contributory negligence, and accordingly remand for further factual determination consistent with the following discussion.
 
 
 11
 As noted above, the trial court declined to find whether or not Williams instructed Terry to engage the power. Williams asserts that the burden of proof on that issue rested with Brasea by reason of its allegation that Williams gave the order in support of its contributory negligence claim. Form there Williams argues that, since the court made no finding, and the burden of proof was on Brasea, a failure to carry that burden below means that we must assume on appeal that the order was not given. We find that argument imaginative but unavailing. The fact that the court did not make a factual finding is the functional equivalent of not passing on whether the burden of proof was carried-- not a premise from which to infer that the burden was not carried. Specifically, the district court held that Terry was negligent even if the order was given; thus that it was unnecessary to resolve the factual dispute.
 
 
 12
 On the subject of Terry's negligence, we review the record mindful that factual ceterminations are to be overturned only if clearly erroneous. F.R.Civ.P. 52(a). McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20. This court has consistently interpreted that rule to mean that a finding of fact should not be reversed if supported by substantial evidence. Lentz v. Metropolitian Life Ins. Co., 5 Cir. 1970, 428 F.2d 36. We reiterate that the lower court concluded that Terry was negligent because he failed to make a reasonable effort to be sure that Williams was free from danger when he cut the power on, even if Williams had ordered him to cut it on. We consider that conclusion clearly erroneous in the absence of an additional finding that Terry acted without a direct order.
 
 
 13
 Brasea's brief accurately demonstrates the fallacy in this finding of the lower court. The real question is whether Terry was negligent, assuming Williams gave the disputed order. Terry and Williams were but two feet apart, and Terry testified he observed that Williams appeared to be in the clear just as he reached for the power lever. Williams' hands were not visible to Terry, since his vision was blocked by the cathead itself. Thus, in order to exercise the level of care found lacking by the district court, Terry would have had to descend the platform, walk to the side of the cathead to observe Williams' hands, then return to the platform in order to cut on the power; and all this coming after receipt of a direct order form Williams to turn the power on.
 
 
 14
 While we entertain some doubt as to whether this would be negligence as between two crewmen (a question we need not consider), we have no doubt that it was not such as between the master of a vessel and a crewman. A seaman's duty to obey orders from his immediate superior overrides the postulate that the seaman must delay execution of the order until he makes a reasonable effort to be sure that following the order will not injure the superior who gave the order. On this reasoning we determine that the district court's conclusion was clearly erroneous and based on a false legal premise. Indeed, a seaman may not be contributorily negligent for carrying out orders that result in his own injury, even if he recognizes possible danger. Darlington v. National Bulk Carriers, 2 Cir. 1946, 157 F.2d 817. Terry's conduct reflects less in the way of culpability than did that of the seaman in Darlington, and we perceive no valid reason for holding him to a higher standard of care.
 
 
 15
 It needs emphasis here that our contrary determination on this point flows directly from the necessary assumption that Williams gave the order to turn on the power. If that assumption is dispelled upon remand by a factual determination adverse to Brasea that no such order was given, it may follow that Terry was in fact negligent. Our present holding is simply that such a finding cannot stand in the face of an assumption that Williams ordered him to turn on the power.
 
 
 16
 The clearly erroneous talisman of Rule 52(a) F.R.Civ.P. governs in considering the merits of Williams' appeal from the district court's finding that he was contributorily negligent. While his argument focuses upon events leading up to the accident, we feel that solution of this problem is inseparably linked to the issue of Terry's alleged negligence discussed above.
 
 
 17
 The district judge stated that Williams employed the most dangerous of several alternative methods for untangling the line from the cathead. This appears from study of his memorandum-opinion to be the sole undergirding for reducing the final award by 40%. As noted above, the opinion stressed that instead of using his hands, he could have pried the line loose with a Stillson wrench or crowbar, or he could have cut the line anywhere above the cathead. Williams attacks this, arguing: (1) that the alternative methods were either drastically impractical or not necessarily safer; (2) that a finding of contributory negligence cannot stand when there was a lack of proximate cause due to the intervening, unforeseeable negligence of Terry; and (3) that the district court erred in not relating how it computed the figure of 40% For reducing the final award.
 
 
 18
 The lower court did not find Williams contributorily negligent because he gave an order to turn on the power while untangling the line with his hands, but appeared rather to rely entirely on the use by Williams of his hands when other methods were available. We do not doubt that if Williams in fact ordered the power turned on, it was negligence on his part to do so when one or both of his hands were entangled in the whipline around the cathead. The difficulty arises when we assume the opposite, that he did not give the order. We proceed to an analysis of each of Williams' claims utilizing that assumption.
 
 
 19
 The first question is whether Williams' use of his hands, was contributory negligence in and of itself. The suggested alternative of cutting the line is frail indeed. According to the testimony, lines frequently tangle on catheads, and to cut one each and every time seems both impractical and demonstrative of an extraordinary rather than an ordinary and usual standard of care. But the use of a crowbar or Stillson wrench may have been a practical, viable, and safer option under the circumstances. This point seems to us so close as to require that we defer to the judgment of the trial court as not clearly erroneous.
 
 
 20
 Williams' second argument poses a more difficult question: assuming that Terry acted without an order from Williams, was his action intervening unforeseeable negligence, depriving Williams' contributory negligence of proximate causation with respect to his injury? As to this point we find Williams' argument persuasive.
 
 
 21
 While the hornbook rule advanced by Williams with respect to intervening negligence needs no citation, it is likewise not without exception: 'It is not always necessary, however, to find intervening conduct specifically foreseeable. Courts have held tortfeasors responsible when their conduct threatens a particular sort of result and an unanticipated force intervenes to produce that result. 'Watz v. Zapata Off-Shore Co., 5 Cir. 1970, 431 F.2d 100, 116. In Watz a chain manufacturer sold a chain in which a link had been negligently fused and was thereby rendered weaker than it should have been. Despite negligent use by the purchaser, the damage that resulted when the link failed was found to be proximately caused by the negligent fusion of the link.
 
 
 22
 We recognize the difficulties inherent in drawing fine lines between foreseeable negligence and contributory negligence, but conclude that Williams' situation differs from that which obtained in Watz to the extent that Watz is not controlling here. The focus in Watz was upon the threat posed by selling a chain with a defective link. The danger was that it might fail even when used in lifting loads within its stated capacity. While abuse of the chain was not specifically foreseeable, the chain manufacturer's negligence threatened a particular sort of result, i.e. the breaking of the chain. But the same observation does not fit Williams' conduct, which did not threaten any sort of result, save the untangling of the line, until the completely unforeseeable intervention of Terry's (assumed) negligence. On remand, should the district court find that Terry was not acting under Williams' order, it should conclude that Williams' negligence was not a contributing proximate cause of his injury.
 
 
 23
 We need spend little time with Williams' assertion of error in the trial court's failure to state the underpinning for its 40% Reduction of the amount of his award because of contributory negligence. This feature of the decision below falls with our reversal for further findings as to Brasea's (and Terry's) negligence and Williams' contributory neglignece. If upon remand Williams is again found contributorily negligent, the percentage reduction of his award should be related to the evidence by an appropriate finding.
 
 
 24
 This analysis disposes of the most significant aspect of both Williams' and Brasea's appeals, but several other issues are raised and require consideration. Williams also attacks the trial court's modification of final judgment by which the originally found joint and several liability of the defendants was changed to primary-secondary. This was done by applying the divided damages rule, limited to maritime law, under which each tortfeasor is assessed primary liability for only his proportionate share, in this case one-third, and secondary liability as to the remainder. See, e.g., Crain Bros., Inc. v. Wieman & Ward Co., 3 Cir. 1955, 223 F.2d 256. Williams argues that the divided damages rule is limited to collision cases and was thus improperly applied below in this case. The Supreme Court has recently ruled otherwise in Cooper Stevedoring Co., Inc. v. Fritz Kopke, Inc., et al., 1974, U.S. , 94 S.Ct. 2174, 40 L.Ed.2d 694 (decided May 28, 1974) where this Court's award of contribution between joint tortfeasors in a noncollision maritime case, 5 Cir., 479 F.2d 1041, was affirmed as proper under the circumstances. Cf. also Empire Seafoods v. Anderson, et al., 5 Cir. 1968, 398 F.2d 204. We determine, infra, that Bender and CMC are not liable in damages, so that the applicability of the divided damages rule need not be answered here.
 
 
 25
 Williams argues also that it was improper to reduce his judgment by 40% Under the comparative negligence doctrine of maritime law as against Bender and CMC, who were found liable under a products liability theory. The argument is that since strict liability under Sec. 402A of the Restatement is not barred by contributory negligence, that negligence should not be used to effect a percentage reduction of an award premised upon a violation of that section. We recognize at least arguable merit in Williams' position, but resolution of the issue must await an appropriate case, since this point also is moot in light of our reversal of the trial court's finding of liability on the part of Bender and CMC.
 
 
 26
 Finally, Williams alleges that the district court erred by failing to enter judgment in rem against CIAPESC I despite the fact that the vessel was found to be unseaworthy. The point is well taken. The lower court specifically found the CIAPESC I unseaworthy, App. at 1754, and that finding is not challenged on appeal by Brasea either on brief or at oral argument. The district court on remand should make the appropriate modification on its final order.
 
 III BRASEA'S CROSS-APPEAL
 
 27
 Brasea's liability was grounded upon both the negligence of Terry, under the doctrine of respondeat superior, and the unseaworthiness of the CIAPESC I. On cross-appeal Brasea asserts error with respect to the lower court's finding of negligence by Terry and its denial of indemnity as against Bender and CMC. We have already dealt with the interrelated negligence issues, and ordered a remand on the subject. We turn our attention to the indemnity issues.
 
 
 28
 There is more than one string to Brasea's indemnity bow, and we will summarize each briefly. First it is argued that the indemnity principles of Ryan[2] should be applied in this case. Ryan established the now familiar doctrine that a stevedoring contractor's agreement to perform all of a shipowner's stevedoring operations necessarily includes the consensual implied obligation to stow cargo properly and safely, (noe usually referred to in the cases as WWLP, or warranty of workmanlike performance), and affirmed the Second Circuit's award to the shipowner of indemnity against the stevedoring company for the amount recovered by one of the contractor's longshoremen employees for injuries sustained while unloading a ship due to improper stowage, and held that shipowner's failure to discover and correct contractor's own breach of contract could not excuse such breach. The exclusiveness of liability provision of the Longshoremen's and Harborworkers' Compensation Act, Sec. 5, 33 U.S.C. Sec. 905 was held by the Court to be no bar to the indemnity claim.
 
 
 29
 The inappositeness of Ryan to the present case is apparent. Naturally, if on remand Terry (and hence Brasea) is found to have been negligent, then the sole cause of Brasea's liability will not be the conduct of either Bender or CMC. The analogy fails for added reasons. Ryan was limited to a situation of contract breach, but no such obligation existed here. Most importantly, the stevedore in Ryan was found negligent. Bender and CMC were expressly found not to have been negligent, and we reverse, as will be seen below, Parts IV and V, the strict liability judgment. Nothing is left upon which Brasea can base an argument for indemnity flowing from contractual or quasi-contractual breach.
 
 
 30
 Brasea's second theory comes closer to the mark, but is still unavailing. The argument seeks to apply here the indemnity principles we employed in Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Co., 5 Cir. 1969, 410 F.2d 178. In Tri-State indemnity was based upon a major-minor/active-passive tort theory, as opposed to the contractual theory of Ryan. A member of a drilling crew on board a submersible barge was injured as a result of defective equipment which had been furnished by Tri-State. Delta Drilling, whose sole liability was due to unseaworthiness because of the defective equipment, was held indemnified as the passive tortfeasor by Tri-State, whose active negligence brought about the condition of unseaworthiness.
 
 
 31
 Again, assuming that Terry is not found negligent on remand,[3] the argument still must fail. Even if Bender and CMC were liable in products liability, that is simply another form of passive tort, analogous to unseaworthiness. Thus the parties would have been in pari delicto, as the district court found. But here again, our reversal on the strict liability, Parts IV and V, leaves Bender and CMC without any, much less passive, tort liability.
 
 
 32
 Apparently anticipating the fundamental flaw in its indemnity arguments, Brasea goes on to urge that the lower court erred in finding that Bender and CMC were not negligent. While Brasea may have thought that success here would cure the defect in its indemnity theory, our discussion of that issue amply demonstrates that the claim fails, regardless. But since we reverse on the products liability issue, it is appropriate for us to address the question of possible negligence in order to determine if Bender and CMC should sustain any liability whatever in this action.
 
 
 33
 Here again we are guided by F.R.Civ. P. 52(a), and may overturn only a finding of fact which we determine to be clearly erroneous. The district court discussed the roles of Bender and CMC in the litigation, then specifically found that neither had been negligent. We find substantial evidence to support that conclusion and approve it as correct.
 
 
 34
 Two allegations with respect to CMC's negligence were considered by the lower court. First, there was a question to resolve as to whether the machined taper on the cathead would increase the likelihood of lines tangling. The district court found scant evidence for such a conclusion, after hearing from CMC engineer Koloc, who was called as an adverse witness by williams. App. at 1748. We see no more evidence to support the allegation than did the lower court, and cannot label as erroneous its conclusion of a failure to carry the burden of proof.
 
 
 35
 The failure of CMC to install a braking mechanism on the winch-cat-head assembly was the second factor considered below. In essence, the district court concluded that it was feasible to install a brake and that its absence rendered the winch defective and unreasonably dangerous to users. However, the court also found that this did not constitute the exercise of less than the ordinary standard of care, and that no fault was attributable to CMC. App. at 1752. Support for the latter conclusion was based in part upon testimony that winches, and especially winches on shrimp boats, are practically never equipped with braking devices. CMC cannot be held to have failed to exercise ordinary care by the manufacture of a winch capable of producing injury only when used in such unusual situations as the one involved here. CMC was not shown to have departed from the required standard of care in its design, engineering and manufacture of the winch.
 
 
 36
 Brasea raises nothing to refute these conclusions. Rather, it points to the testimony of CMC engineer Koloc as proof that the winch was not properly tested prior to sale. That theory also was expressly rejected by the lower court, after consideration was given to all the relevant evidence on the point. App. at 1748. The record supports that conclusion and we discern nothing which would require reversal in this regard under the clearly erroneous standard.
 
 
 37
 The strict liability of Bender was based upon the manner in which it positioned the snatch-block frame above the cathead. This is the pulley device through which the whipline runs from the shrimp net to the cathead. Bender's error was found to be in positioning the block too far forward, thus depriving the line of a 'fair lead,' which refers to the angle at which a line runs from the block to the cathead. App. at 1750. This situation increases the probability of lines tangling, and a tangled line was the first in a chain of events leading to Williams' injury.
 
 
 38
 Brasea argues that this defect in positioning, together with the fact that the block was not tested under strain, requires a finding of negligence. But testing the line under strain would have revealed nothing germane to the fair lead problem; the court's finding related rather to positioning. Additionally, the testimony of Thomas Bender was persuasive that his company did in fact exercise care in installation, despite the slightly improper location of the block and hanger frame.
 
 
 39
 Finally, Brasea postulates that CMC should be required to pay 90% Of whatever damages are ultimately awarded. The theory is that but for the lack of a brake on the winch, Williams would have sustained relatively minor injury to his left hand, which was caught when he first yelled for the power to be cut. Medical testimony was introduced to the effect that had Williams only suffered this injury to his left hand he would still have been able to resume 90% Of his normal daily activities after the accident. From this it is argued that CMC's failure to provide a brake produced 90% Of Williams' full disability, and that it should therefore contribute a similar proportion to his monetary recovery. Authority for the argument advanced is asserted to be found in Horton & Horton, Inc. v. T/S J. E. Dyer, 5 Cir. 1970, 428 F.2d 1131. We acknowledge the novelty of the argument, but do not pass upon its merits or the possible application of Horton. Again, our resolution, infra Part v, of the negligence and products liability issues in CMC's favor moots the discussion and its decision.
 
 IV CROSS-APPEAL BY BENDER
 
 40
 At the outset we are met with Bender's claim that the trial court lacked jurisdiction over it. Jurisdiction over Bender, an Alabama corporation, was claimed under the Texas Long Arm Statute, Vernon's Tex.Rev.Civ.Stat.Ann., Art. 2031b (1959). The requisite activity within Texas for jurisdiction to attach is measured by the 'minimum contacts' standard. We have earlier noted that 'the Texas purpose (in enacting article 2031b) was to exploit to the maximum the fullest permissible reach under federal constitutional restraints.' Atwood Hatcheries v. Heisdorf & Nelson Farms, 5 Cir. 1966, 357 F.2d 847, 852. Bender's motion to dismiss for lack of jurisdiction and to quash service addressed to the lower court, was denied by a well reasoned memorandum and order. Williams v. Brasea, Inc., S.D.Tex. 1970, 320 F.Supp. 658. For the reasons there well articulated we hold that the district court had personal jurisdiction over Bender, under the teachings of Hearne v. Dow-Badische Chemical Co., S.D.Tex.1963, 224 F.Supp. 90, applying International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, to the Texas Statute, Article 2031b.
 
 
 41
 Before reaching the merits of the products liability issues in this case, we pause to comment upon the theoretical posture in which they arose. The incorporation of products liability law into general maritime law is of most recent vintage. District courts have divided on the propriety of such incorporation, and only one appellate court has passed judgment thus far on the issue (by approving the incorporation). Lindsay v. McDonnell Douglas Aircraft Corp., 8 Cir. 1972, 460 F.2d 631. We do not believe that a case such as this, which in our judgment fails to establish liability under the theory, presents the appropriate vehicle for consideration of whether that theory should be made part of the maritime law in this circuit. Thus we qualify our holding by saying that even if products liability law is to be incorporated into our general maritime law, there can be no liability under the facts of this case. The question of incorporation vel non is left open for decision at a later date when more guidelines may be available.
 
 
 42
 The district court relied upon the theory of strict liability set forth in the Restatement of Torts 2d, Sec. 402A, which provides, in pertinent part:
 
 
 43
 'One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, . . .'
 
 
 44
 As is evident from the language of the Restatement, three elements of proof must be present: (1) defective condition of the product; (2) unreasonable danger to the user; and (3) proximate cause of injury. Assuming arguendo that Bender's installation of the winch resulted in a lack of fair lead which may be termed a defective condition, our judgment is that it was neither unreasonably dangerous nor a proximate cause of Williams' injuries.
 
 
 45
 The defect alleged was dangerous in that it increased the likelihood of lines tangling on the cathead. It is significant to note that it merely increased the likelihood of an event not at all uncommon on shrimp trawlers, i.e. lines tangling on a cathead. The district court in its Final Order expressly acknowledged this pre-existing likelihood. App. at 1747.
 
 
 46
 Assuming then that the tangling of lines is dangerous, the question then is whether a defect increasing the likelihood of that event makes it unreasonably dangerous. We find the answer in Sec. 402A com. i: 'The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with ordinary knowledge common to the community as to its characteristics.' We are unable to conclude that the tangling which led to Williams' injury was beyond the contemplation of seamen who had common knowledge that lines on shrimp boats frequently tangle. As a matter of elementary logic, such a conclusion would be a manifest non sequitur. We hold accordingly that the position of the snatch block frame was not unreasonably dangerous as a matter of law.
 
 
 47
 In the next place proximate cause is absent under the facts as given. To use common law terms for the moment, the requisite foreseeability was lacking; see Helene Curtis Industries, Inc. v. Pruitt, 5 Cir. 1967, 385 F.2d 841 (foreseeability as part of proximate cause considered in the field of products liability as to hair bleaching products). If Williams ordered the power on, Bender can hardly be charged with anticipating his doing so while his hands were in the line around the cathead. Alternatively, if Terry acted without authority, neither should Bender be charged with foreseeing that he would do so while Williams had his hands in the line.
 
 
 48
 The comments to Sec. 402A support this conclusion in even more precise terms. If Williams ordered the power turned on, comment n would be applicable: 'voluntarily and unreasonably proceeding to encounter a known danger, (which) commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability.' If Terry turned the power on without instruction from Williams, comment g would control: 'The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful . . .' Lines tangle regardless of whether a fair lead problem may exist, but only Terry's mishandling of the product, assuming he acted without authority, produced the injury. Under either or any of the foregoing posited analyses, we hold that Bender could not be properly held liable in products liability.
 
 V CROSS-APPEAL BY CMC
 
 49
 The sole basis of liability arrived at by the trial court as to CMC was its failure to provide a braking mechanism on the winch it sold to Bender. All the crewmen knew it lacked a brake, and the evidence was clear that winches with brakes were almost non-existent on trawlers used by the shrimping industry.
 
 
 50
 Although the district court perceived this omission by CMC as an unreasonably dangerous defect, that characterization is not, strictly speaking, permissible under these facts. According to the commentary, a defective condition obtains only when 'the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, . . ..' Sec. 402A com. g. The winch was not 'defective' because all involved knew that it lacked a brake. This case falls into the category of defective design, situations in which the 'defect' is said to inhere in the design of the product, i.e. lack of a safety device. The 'defect' issue is thus subsumed into a determination of whether that design, though known full well to the user, rendered the product unreasonably dangerous to him. See, for example, Ross v. Up-Right, Inc., 5 Cir. 1968, 402 F.2d 943; Wade, Strict Tort Liability of Manufacturers, 18 S.W.L.J. 5 (1965).
 
 
 51
 The question then arises whether the lack of a brake made the winch 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, . . ..' Sec. 402A com. i. This proposition carries its own answer. The danger posed by the lack of a brake could scarcely be beyond the contemplation of crewmen who knew of its absence and worked with the winch in that condition on a daily basis.
 
 
 52
 Our conclusion is further supported by the theoretical approach advocated by Wade, supra, and others in defective design cases. Unreasonable danger is assessed under a cost-benefit analysis of the proposed safety device. Paraphrasing the variables suggested by Dean Wade, 19 S.W.L.J. at 17, we find the following in support of a 'cost outweighs benefit' conclusion here: (1) catheads are practically indispensable to the shrimping business; (2) few, if any, are equipped with a braking device; (3) the likelihood of injury is remote, limited to peculiar circumstances such as occurred in this unusual case; (4) the inherent danger is obvious to all; (5) injury could have been avoided but for the misuse of the product; and (6) installation of a brake would substantially increase the cost of the winch.
 
 
 53
 When we come to the element of proximate cause, CMC occupies a position nearly identical to that of Bender. Depending on whether an order to turn on the power was given by Williams or not, either assumption of risk or unanticipated product misuse, as described in comments n and g, Sec. 402A, may properly be inferred. We further think it manifest that such action is not the foreseeable type of conduct which should give rise to a holding of strict liability against a manufacturer.
 
 VI CONCLUSION
 
 54
 Our holdings are summarized as follows: (1) the case is remanded for a factual finding as to whether Williams ordered Terry to engage the power; (2) the district court is ordered to assess liability in rem as to the vessel CIAPESC I; (3) the district court's dismissal of the indemnity claims is affirmed; (4) the district court's finding that Bender and CMC were not negligent is affirmed; (5) the district court's finding of product liability is reversed; (6) Bender and CMC are due to be dismissed as parties defendant.
 
 
 55
 Affirmed in part, reversed in part and remanded with directions.
 
 
 
 [1]
 While there may have been room for question at the time of trial as to whether Terry was an employee of Brasea for purposes of the latter's vicarious liability, that issue is now settled adversely to Brasea. See Bishop v. United States, 5 Cir. 1973, 476 F.2d 977
 
 
 [2]
 Ryan Stevedoring Company, Inc. v. Pan-Atlantic Steamship Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133
 
 
 [3]
 If Terry were to be found negligent, Brasea could not possibly be a 'passive' tortfeasor. Contrary to its assertion to that effect on brief, vicarious liability through the doctrine of respondeat superior is not functionally equivalent to 'passive' negligence. See Barrios v. Louisiana Construction Materials Co., 5 Cir. 1972, 465 F.2d 1157