**Mary Sally TISDALE, Plaintiff,**

v.

**TELEFLEX, INC., Eldocraft Manufacturing Company, Inc., and Outboard Marine Corporation, Defendants.**

No. 82–1992–8.

United States District Court,
D. South Carolina,
Charleston Division.

Feb. 22, 1985.

John D. Jones, Steven J. Misner, Greene, Buckley, DeRieux & Jones, Atlanta, Ga., for plaintiff.

B. Allston Moore, Jr., Burnet R. Maybank, III, Buist, Moore, Smythe & McGee, Charleston, S.C., Francis P. Manchisi, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, N.Y., for Teleflex, Inc.

J.W. Cabaniss, Grimball & Cabaniss, Charleston, S.C., for Eldocraft Manufacturing Co. ·

G. Dana Sinkler, Sinkler, Gibbs & Simons, Charleston, S.C., Alex B. Marconi, Senior Counsel, Outboard Marine Corp., Waukegan, Ill., for Outboard Marine Corp.

## MEMORANDUM OF DECISION

DUPREE, District Judge.

Invoking the court's admiralty jurisdiction under Rule 9(h) of the Federal Rules of Civil Procedure plaintiff, Mary Sally Tisdale, instituted this action for damages for personal injuries in August of 1982 against defendants, Teleflex, Inc. (Teleflex), Eldo Craft Manufacturing Company, Inc.[1] (Eldocraft) and Outboard Marine Corporation (OMC). Plaintiff alleges that she was severely and permanently injured in a boating accident which occurred on navigable waters near Charleston, South Carolina on October 27, 1979. The plaintiff's cause of action is based on allegations of defects in the manufacture of the boat in which she was a passenger at the time of the accident and its accessory equipment. Liability of the defendant manufacturers of the boat and its equipment is sought to be imposed on principles of negligence, breach of warranty and strict liability in tort.

The defendants timely filed answers denying all liability to the plaintiff and pleading defenses of contributory negligence, assumption of risk and the intervening, superseding negligence of the operator of the boat. On the issues thus joined the case came on for trial and was tried by the court without a jury over a two-week period in November of 1984. Thereafter the parties submitted proposed findings of fact and post-trial briefs, and in this memorandum of decision the court now enters its findings of fact and conclusions of law. Rule 52, F.R.Civ.P.

In March, 1974 Wallace Tisdale, a retired Navy petty officer living in the Charleston, South Carolina area, purchased from an independent dealer a 15–foot motor boat which had been designed, manufactured and sold by Eldocraft. Known in the trade as a "bass boat," the boat was used by Tisdale primarily for fishing in the inland, navigable waters in the Charleston area. The boat was originally powered by a 45–horsepower Chrysler outboard motor and it was equipped with a "stick steerer" manu-

---

**1.** This defendant was so identified in the caption to plaintiff's amended complaint filed October 15, 1984, but throughout the litigation it has been referred to as "Eldo Craft Boat Company," "Eldocraft Boat Manufacturing Company, Inc.," etc. The correct corporate name of this defendant is said to be El Do-Craft Boat Company, Inc., but no question is raised as to the correct identification of this defendant.

factured by Teleflex. The boat was equipped with two pedestal seats, one forward and one aft, each of which rotated 360 degrees thus enabling the occupants to fish in any direction from the boat.

Weather permitting, Tisdale apparently spent a substantial part of his waking hours fishing with the result that by 1979 he had completely worn out the Chrysler engine on his boat, and in the spring of that year he replaced it with the 55–horsepower Evinrude engine manufactured by defendant OMC which he was operating at the time of the accident.

The boat was operated from the front pedestal seat near its bow, and when facing forward the throttle control was mounted on the right side of the boat and the stick steerer was mounted on the left side. The stick steerer, as the name implies, consists of a rod of approximately twenty inches in length on the top of which is a ball of the approximate size of a billiard ball. This "stick" extends vertically from a drum assembly which houses cables extending rearward to the engine and which control its movements to each side as it pivots on its mountings. Pushing the stick forward causes the engine to pivot to the starboard and the boat to make a right turn. Pulling back on the stick causes the engine to pivot to port and the boat to make a left turn. When the stick is in the vertical position the boat moves straight ahead, but if the stick is released the torque force created by the engine will gradually at first and then more rapidly cause the boat to go into a right turn.

On the late afternoon of October 27, 1979 the plaintiff, who was then Mary Sally Davis, and who has since married Wallace Tisdale, was a passenger in the Tisdale boat from which they had been fishing on Flagg Creek, a small tidal creek off the Cooper River near Charleston. Davis and Tisdale had been keeping company for a short time, but this was her first trip in Tisdale's fishing boat. About sunset they stopped fishing and prepared to return to the boat landing. Because she had begun to get chilly, Davis, who had been seated in the rear pedestal seat, went to the bow of the boat and assumed a kneeling position between Tisdale's legs and facing him as he sat in the front pedestal seat with his right hand on the throttle and the left hand on the stick steerer.

While they were in these positions Tisdale accelerated the engine and started the trip back to the landing. When the boat had reached a speed of approximately fifteen miles an hour it suddenly went into a sharp right turn which caused Tisdale and Davis to be ejected into the water from the port side of the boat. What happened immediately thereafter is not readily determinable from the evidence, but it is clear that the boat continued to circle to the right, and either on the first time around or thereafter Davis was severely injured when she was struck by the skeg or propeller of the boat engine. As a result of her injuries the plaintiff has incurred medical expenses of upwards of $50,000, and while she suffers from a variety of other unrelated ailments, her medical problems attributable to injuries received in this accident are of a permanent and disabling nature.

As to the cause of this accident the Tisdales at one time or another have given at least three conflicting versions as to how it happened. In 1980 Sally Davis brought an action against Wallace Tisdale in this court alleging that his negligence and recklessness caused her injuries and demanding actual and punitive damages from him. At that time she alleged that Tisdale had been negligent in reaching for a coat while traveling at full speed in the boat or by allowing the steering stick to become caught in his sleeve.[2] At other times the Tisdales have contended that when Tisdale took his hand off the stick steerer momentarily the stick fell forward causing the boat to go into the sharp right turn.

---

**2.** This action was settled for $20,000 on a covenant not to sue and thereafter Davis married Tisdale and brought the present action against the manufacturers of the various components of Tisdale's boat.

The court finds the most believable story given by the Tisdales as to how the accident happened is what they said immediately following the accident and before any litigation was instituted or even contemplated. In the accident report required to be filed by Tisdale shortly after the accident he stated that the boat struck an underwater obstacle causing him to lose control and that the boat thereupon went into a violent turn to the right. The plaintiff herself originally confirmed this version of the accident, and following the accident it was determined that the skeg (the vertical metal shield which partially surrounds the propeller protecting it from striking objects in or out of the water) was damaged as the obvious result of a blow which it had sustained, but while this damage may very well have been incurred at the time of the accident, the court is unable to determine with any certainty that this was the case.[3]

The violence of the turn which the boat took at the time of the accident is attested by the fact that Tisdale, a 240–pound man, and the plaintiff, a 140–pound woman, were thrown clear of the boat and in the process the arm rest on the seat occupied by Tisdale was torn off. The court is satisfied that the boat's sharp turn was not attributable to any momentary release of the stick steerer by Tisdale, for movies introduced at the trial by the plaintiff showed that while a momentary release of the stick will result in a gradual turn to the right, this can be promptly corrected by regaining control of the stick. Wallace Tisdale, in fact, testified that he had had occasion to remove his hand from the stick momentarily (as when he would slap a mosquito) but that he had never had any difficulty in bringing the boat back under control promptly. As a boat operator with thousands of hours of experience it is simply not plausible to assume that on this occasion a momentary

release of the stick resulted in the boat's becoming uncontrollable.

The court also rejects the suggestion by plaintiff that maladjustment of the tilt and trim tab devices on the engine may have caused the boat to go into its violent right turn. Here again Tisdale testified that he had never experienced any difficulty attributable to such causes in the five years he had been operating the boat prior to the accident.

Thus the court concludes on all of the evidence that by far the most likely cause of this accident was the striking of a submerged object by some part of the boat's engine assembly, and the court so finds.

█ It appears now to be well settled that the admiralty jurisdiction of the court is properly invoked in actions arising out of the use of pleasure craft on navigable waters. *Foremost Insurance Company v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982); *Souther v. Thompson,* 754 F.2d 151 (4th Cir.1985); *Oliver v. Hardesty,* 745 F.2d 317 (4th Cir.1984). Additionally, the parties in this action are agreed that in such actions federal maritime law applies but in the absence of controlling maritime law principles South Carolina law governs.[4] *Wilburn Boat Company v. Fireman's Fund Insurance Company,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); *Continental Oil Company v. Bonanza Corporation,* 677 F.2d 455 (5th Cir.1982).

█ Both admiralty law and the law of the State of South Carolina recognize the doctrine of strict liability as enunciated in Restatement of Torts (2d) § 402–A. Under this doctrine the exercise of due care in the manufacture of a product will not relieve the manufacturer of liability. Rather, a plaintiff need only prove that the product

---

**3.** In response to questioning at the trial Tisdale said that he knew of no other accident which could have caused this damage to the skeg.

**4.** As stated in plaintiff's first proposed conclusion of law,

the instant action, being brought under the court's admiralty jurisdiction is governed by federal maritime law. Where a clearly established principle of federal maritime law applies, that law is applied. In the absence of such clearly established principles, the court is governed by the laws of South Carolina.

was defective and unreasonably dangerous when it was placed in the stream of commerce. Thus the focus of the trier of fact is upon the product itself, not the conduct of the manufacturer. *Reed v. Tiffin Motor Homes, Inc.*, 697 F.2d 1192 (4th Cir.1982).

Notwithstanding the parties here are agreed that the doctrine of strict liability is applicable in admiralty, the plaintiff, apparently in deference to the fact that the boat and its stick steering system were manufactured and sold by Eldocraft and Teleflex prior to the adoption of strict liability in South Carolina, S.C. Code Ann. § 15–73–30 (1976), has sought to hold Eldocraft and Teleflex solely on principles of negligence and breach of implied warranty. Since the Evinrude motor was manufactured and sold by defendant OMC after the effective date of the South Carolina strict liability statute, plaintiff seeks to hold that defendant on principles of strict liability. Despite the apparent concession by plaintiff that her claims against Eldocraft and Teleflex are not to be considered as strict liability claims, in view of the agreement on all sides that the doctrine of strict liability obtains in admiralty, the court has chosen to apply the doctrine in this case with respect to each of the three defendants.

This brings us to a discussion of plaintiff's claims as they relate to each of the defendants.

## PLAINTIFF'S CLAIM AGAINST ELDOCRAFT

■ As previously stated, in 1974 Wallace Tisdale purchased the boat involved in the accident from an independent dealer in the Charleston area. It had been manufactured and outfitted with the Teleflex stick steering system by Eldocraft at its plant in Arkansas in 1973. The boat was of the standard bass fishing boat design which meant that it had low gunwales, a relatively flat bottom and two swivel seats each of which rotated 360 degrees to permit cast fishing in any direction. Described by one witness as a "floating platform," the boat was designed to operate in shallow waters and to accommodate bass fishermen, of which Tisdale was a most ardent one, in the sport of bass fishing.

Tisdale was well acquainted with this type boat and the stick steering system with which it was equipped, and the primary reason he bought it was because it had the features mentioned. At the time of the accident, it was estimated that he had used the boat between 2,000 and 3,000 hours. He had never had any kind of accident with the boat prior to the one in question here.

The plaintiff offered the testimony of two expert witnesses, Robert Swint and Robert Warren, who testified that in their opinion the Teleflex steering system was inherently unsafe; that the boat should not have been operated with an engine which did not have a "kill switch," that is, an ignition switch device attached to the boat operator by a lanyard which would cause the engine to stop if the operator left his seat for any purpose. These witnesses also testified that the position of the operator on the seat was unsafe since it was level with or above the gunwales thus increasing the likelihood that the operator would be thrown out of the boat during a violent turn and that the seats should have been equipped with a device which would lock them in place when the boat was underway.

Plaintiff alleged and offered this evidence to prove as against Eldocraft that that defendant was negligent in the design and manufacture of the boat; the failure to provide necessary safety devices; and the failure to warn Tisdale and the plaintiff of these defects.

A careful review of all the evidence as it relates to the defendant Eldocraft has led to the conclusion that the plaintiff has failed to establish her cause of action against this defendant by a preponderance of the evidence. Concededly some of the features of this bass boat to which reference has been made tend to make it a less safe vessel in which to ride at high speeds, but these features were the very thing that which Tisdale was looking for when he purchased the boat. For ease and conve-

nience in fishing he wanted the swivel seats and the stick steering system, and he was fully acquainted with the characteristics and possible hazards involved in employing this particular equipment. There was no duty to warn him of something which he already knew. Apparently hundreds of thousands of these bass fishing boats have been manufactured, and they are still being marketed with these same features of which plaintiff now complains. No public statute, rule or regulation has ever prohibited their manufacture and sale.[5]

Eldocraft is not chargeable with the failure of the OMC engine to be equipped with a kill switch for the simple reason that Eldocraft had nothing to do with the selection and installation of this engine in the boat some five years after its purchase by Tisdale. And again, there was no duty to warn him about the failure to equip the engine with a kill switch, for he already knew about kill switches, their ready availability to him and the purpose which they served.

Even if it be conceded that Eldocraft was negligent in any of the respects alleged or that it breached its implied warranty of fitness, it was still incumbent upon plaintiff to establish that such negligence or breach of warranty constituted a proximate cause of the accident and plaintiff's resulting injuries. Plaintiff was unable to do this for the simple reason that the accident was caused by the boat's striking a submerged object, and there was no evidence from which the court can find that the accident and its consequences would not have occurred if the boat had been equipped with any other type of steering mechanism, or if the seats had been of any other height and equipped with a locking mechanism, or if the engine had been of greater or less than 35 horsepower capacity.

In sum, the plaintiff has failed to prove her case as against defendant Eldocraft

which is therefore entitled to judgment of dismissal.

## PLAINTIFF'S CLAIM AGAINST TELEFLEX

■ Teleflex manufactured the stick steering system which was installed in the boat at the time it was manufactured and sold by Eldocraft. This steering system was developed in the 1960's in response to the demands of bass fishermen who wanted a steering system which would allow fishing lines to be cast from the front seat of the boat without the interference of a steering wheel. During the period 1970 to about 1978 Teleflex manufactured approximately 75,000 of these steering systems of which approximately seventy-five per cent were sold for use on bass boats. Admittedly the system is more sensitive than the conventional steering systems operated from a steering wheel, but as we have seen the sensitiveness of the stick steering system was not a cause of the loss of control of the boat. Rather, it was the sudden striking of the submerged object, and the evidence showed that when this happens, regardless of whether a boat is equipped with stick steering or wheel steering it is impossible for the operator to maintain control. Of the thirty-odd cases in which the witness Swint had testified involving ejection of occupants of a boat only about seven of the boats had been equipped with stick steering while the remaining twenty-three boats had been equipped with wheel steering.

For reasons not related to safety or accident experience Teleflex ceased to manufacture its stick steering systems about 1978, but other manufacturers continued to market this system, and there has never been any public statute, rule or regulation governing the use of stick steering on bass boats.

What has been said with respect to the failure of the evidence to establish proximate causation between Eldocraft's alleged

---

**5.** There was evidence that an association of bass fishermen had promulgated a rule prohibiting the use of stick steering on bass boats used in fishing tournaments when equipped with engines of more than 35 horsepower.

negligence and breach of warranty and plaintiff's injuries applies with equal force to Teleflex, and even if this defendant were chargeable with any negligence or breach of warranty in connection with the manufacture and sale of its stick steering system, plaintiff's evidence has failed to establish such as a proximate cause of her injuries. Plaintiff's action as to Teleflex must therefore be dismissed.

## PLAINTIFF'S CLAIM AGAINST OMC

■ Plaintiff's claim against OMC is not based on any alleged defect in the 55–horsepower Evinrude engine which it manufactured and which Tisdale installed in his boat in early 1979 when he replaced the worn out engine which he installed at the time he purchased the boat in 1974. Indeed, at the time of the trial which was just over five years after plaintiff's accident Tisdale was still using this Evinrude engine, and so it must have been a good one. Since, as we have seen, any alleged defect attributable to the tilt pin and trim tab settings could not have been a proximate cause of the accident, plaintiff's case against OMC comes down to a question of whether liability shall attach by reason of OMC's failure to equip the Evinrude engine with a kill switch or to warn purchasers of the engine of the need for a kill switch and the consequences of their failure to use it.[6]

Turning first to the applicable law, as previously noted the court is of opinion that since the court's admiralty jurisdiction has been invoked, federal maritime law which has incorporated the doctrine of strict liability in tort controls. No federal statute, rule or regulation has ever been adopted which required the installation of kill switches on marine engines used on pleasure boats of the kind involved here. Plaintiff stressfully contends, however, that the Federal Boat Safety Act, 46 U.S.C. § 1461, *et seq.*, defines the duties of care of the defendants in this case. 46 U.S.C. § 1461 provides in part:

(a) No person shall—

(3) fail to furnish a notification as required by section 1464(a) of this title or exercise reasonable diligence in fulfilling the undertaking given pursuant to section 1464(c) of this title.

46 U.S.C. § 1464(a) provides:

Every manufacturer who discovers or acquires information which he determines, in the exercise of reasonable and prudent judgment, indicates that a boat or associated equipment subject to an applicable standard or regulation prescribed pursuant to section 1454 of this title either fails to comply with such standard or regulation, or contains a defect which creates a substantial risk of personal injury to the public, shall, if such boat or associated equipment has left the place of manufacture, furnish notification of such defect or failure of compliance as provided in subsections (b) and (c) of this section, within a reasonable time after the manufacturer has discovered the defect.

46 U.S.C. § 1464(c) provides:

The notification required by subsection (a) of this section shall contain a clear description of such defect or failure to comply, an evaluation of the hazard reasonably related thereto, a statement of the measures to be taken to correct such defect or failure to comply, and an undertaking by the manufacturer to take such measures at his sole cost and expense.

Since Section 1454 of the Act does not prescribe any standard or regulation with respect to kill switches, plaintiff's claim that OMC violated the Act must be based upon the contention that the failure of the Evinrude engine to be equipped with a kill switch rendered it defective and created a substantial risk of personal injury to the public which in turn gave rise to a duty to furnish notification of such defect to its customers.

---

**6.** OMC has never contested the feasibility of equipping its engines with kill switches, and the evidence showed that the cost of incorporating such a device in an engine would be something less than $10.

While it is by no means clear from a close reading of this statute that it was intended to cover defects in design such as the failure to incorporate a safety device in a product, for purposes of discussion the court has assumed that such defects are covered. The question for decision, then, is whether OMC's failure to equip its engine with a kill switch rendered it defective within the purview of strict liability law thus giving rise to the duty to warn of the need for and the consequences of the failure to use a kill switch with this engine. A careful review of the evidence and the applicable law has led the court to conclude that the question must be answered in the negative.

The kill switch device has been in use for twenty or more years, and the desirability of requiring that engines on pleasure craft be equipped with kill switches has apparently been debated for a long time. The United States Coast Guard made a study of the question and concluded not to issue a regulation requiring kill switches. Required by federal law to justify its regulations on the basis of cost effectiveness, the Coast Guard found that about 7,250,000 boats would be affected by the regulations and that the prospective cost per life saved by the device would be $1,600,000. This was determined not to be "cost effective." It is significant, however, that the Coast Guard has not recommended the use of kill switches on pleasure craft of the type here involved.[7]

As is usual in these cases, the testimony of the expert witnesses offered by plaintiff and defendants was sharply conflicting. Plaintiff's experts testified that in their opinion any bass boat equipped as was the one in this case which did not have a kill switch on its engine was inherently dangerous, while defendants' experts testified to the contrary and pointed out that kill switches themselves might pose as great or greater danger to occupants of a bass boat in that the sudden, unintentional activation of the switch by the operator's moving about in the boat and its resulting deceleration might cause occupants to be thrown about in the boat or overboard with the possibility of serious injury. While the court finds merit in the arguments of each set of experts, it is unable to say that the evidence of either side preponderates but is inclined to regard the evidence on this score as being evenly balanced, which, standing alone, would justify decision in defendants' favor.[8] *Welch v. Outboard Marine Corporation*, 481 F.2d 252, 256–7 (5th Cir.1973). (Testimony of expert that lawnmower met all industry standards for the year it was manufactured and that the safety devices suggested by plaintiff would present other functional and safety problems supported jury finding that design of lawnmower was not unreasonably dangerous for normal use.)

The doctrine of strict liability in tort is set forth in Section 402A of the Restatement (Second) of Torts (1965) which was adopted as law in South Carolina in 1976. S.C.Code Ann. § 15–73–10 (1976) provides:

Section 15–73–10. Liability of seller for defective product.

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his

---

**7.** The use of kill switches is required by state law in only one state, Alabama, and the law in that state only requires kill switches on engines of 50-horsepower and over.

**8.** The opinions of plaintiff's experts were premised on the assumption that Tisdale was ignorant of the hazards inherent in his boat and the need for added safety precautions such as the installation of a kill switch. Aside from the fact that this ascribes to this 44-year-old ex-seaman with twenty-eight years' experience in the Navy, including experience in small boats, a completely unrealistic naivete and one totally at variance with the impression which he left with the court, by his own admission Tisdale never bothered to read the owner's manual furnished him at the time he purchased the OMC engine which instructed him how to adjust the trim tab and tilt pin on the engine and told him to see his dealer about kill switches, and neither he nor the plaintiff were wearing the life jackets with which the boat was equipped at the time of the accident. On this evidence it is highly speculative to conclude that this man would have equipped his boat with a kill switch or that he would have used it if he had bought one.

property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in subsection (1) shall apply although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

While this case is governed by principles of maritime law (including, as we have seen, the doctrine of strict liability) the court is technically not bound by the body of case law which has developed in South Carolina since the enactment of this statute. For reasons which will be detailed later the court has nevertheless found the South Carolina authorities persuasive, and application of developing principles of strict liability law in the South Carolina cases to facts of the case at bar leads unerringly to the conclusion that the kill switch question should be resolved in favor of OMC.

These principles have been summarized in the virtually indistinguishable case of *Young v. Tide Craft, Inc.*, 270 S.C. 453, 242 S.E.2d 671 (1978). That was a wrongful death action against the manufacturer of a boat similar to the one involved here. The accident which resulted in the operator's death occurred when the cable connecting the boat's stick steerer to its outboard engine parked and the operator was thrown overboard and drowned. In reversing a jury verdict for the plaintiff the South Carolina Supreme Court held that the splicing and resulting disengagement of the steering cable were not acts for which the boat manufacturer was responsible, but in that case, as here, the claim was made that the failure of the boat to be equipped with a kill switch on its engine

rendered it inherently defective. In rejecting this claim the South Carolina court said:

Tide Craft's failure to install a kill switch warrants separate consideration. A kill switch is a safety device which cuts electrical power to a boat's motor whenever the operator is thrown from his seat and is no longer in a position to control the boat. With the electrical power disconnected, the motor will cease functioning and the boat will come to a stop. This device is attached to the motor and ignition system neither of which is manufactured by Tide Craft. Even assuming that Tide Craft had responsibility in this area, it is clear to us that the absence of this device did not constitute a breach of warranty, an unreasonably dangerous defect, or lack of due care on the part of Tide Craft.

To warrant recovery under the strict liability in tort theory, the absence of the kill switch must constitute a defect "unreasonably dangerous to the user or consumer," S.C.Code § 15–73–10 (1976). As pointed out in *Skyhook Corp. v. Jasper*, 90 N.M. 143, 560 P.2d 934 (1977), the test of whether or not the "failure [to incorporate a safety feature or device in a product] constitutes a defect is whether the product, absent such feature or device, is unreasonably dangerous to the user or consumer or to his property," 560 P.2d at 938.

The question that presents itself is whether the absence of the kill switch *per se* rendered the boat "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics," Restatement (Second) of Torts § 402A, com. i (1965). In applying this test to a situation in which the manufacturer of a winch used on fishing boats failed to include a brake on the winch, the court in *Williams v. Brasea, Inc.*, 497 F.2d 67 (5th Cir.1974), *cert. den.*, 423 U.S. 906, 96 S.Ct. 207, 46 L.E.2d 136 (1975), stated: "The danger

posed by the lack of a brake could scarcely be beyond the contemplation of crewmen who knew of its absence and worked with the winch in that condition on a daily basis." *Id.* at 79. It is common knowledge that a normal risk of boating is that of being thrown overboard. While the test set out above is an objective one and knowledge common to the community must be attributed to Young, there can, nevertheless, be no question of his awareness of this risk. His wife testified that Young had fished almost every weekend for the past ten years. He had often used boats and his wife felt he was relatively familiar with them. Young being aware of the normal risks of boating, the danger posed by the obvious lack of a kill switch could hardly be beyond his contemplation. Accordingly, the lack of a kill switch does not constitute a defect within the meaning of the strict liability in tort statute.

From the foregoing it is seen that as a prerequisite to the application of the doctrine of strict liability to a case South Carolina requires both a showing that the product in question is defective and is unreasonably dangerous to the user or consumer. The Fourth Circuit has adopted this view of the law in *Purvis v. Consolidated Energy Products Company*, 674 F.2d 217 (1982), where Chief Judge Winter said:

> Under the formulation of the Restatement (Second), the policies of strict products liability come into play only as to products "in a defective condition unreasonably dangerous to the user or consumer or to his property." Restatement (Second) § 402A.[10] To be unreasonably dangerous within the meaning of section 402A, a defective product "must be dangerous to an extent beyond that which would be contemplated by the ordinary purchaser who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.,* Comment i.

*Id.* at page 222. Footnote 10 referred to in the quotation reads in pertinent part as follows:

Some courts hold that a plaintiff who proves that he was injured by a product defect may recover under the doctrine of strict products liability without showing, as a separate element of proof, that the defect was unreasonably dangerous (citing cases). Other courts require proof that the product is both defective and unreasonably dangerous (citing cases).

We think that the language of section 402A of the Restatement (Second) favors the latter position. To our knowledge, moreover, the Supreme Court of South Carolina has never applied strict products liability in a case not involving an extraordinary hazard or accident. Although that court may some day decide that unreasonable dangerousness is not an element of a section 402A claim, existing precedents afford us no basis for anticipating such a development.

Cases in other jurisdictions involving products alleged to have been inherently dangerous by reason of their failure to incorporate a kill switch have reached the same result as did the South Carolina court. In *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743 (1980), the Supreme Court of Texas upheld a jury verdict which had concluded that a fishing boat which had no kill switch on its engine was not defectively designed. In *Pressley v. Sears-Roebuck and Company*, 738 F.2d 1222 (11th Cir.1984), the court affirmed the granting of partial summary judgment to the defendants under the plaintiff's theories of negligence and strict liability in tort for failure to equip a lawnmower with a deadman (kill switch) control or other like safety feature. In that case the court said:

> A manufacturer is under no duty to guard against injury from a patent peril or from a source that is manifestly dangerous. There is no duty to warn of obvious common dangers connected with the use of a product.... There was no evidence presented to the court suggesting that the absence of a deadman device rendered the lawn mower unsuitable for mowing grass, its "intended use."

There is no statutory requirement or industry safety standard that would impose upon either Roper or Sears an obligation to manufacture and to sell only those lawn mowers equipped with deadman devices. Although the lawn mower in this case is arguably potentially dangerous, the lack of such a device was open and obvious. Pressley acknowledged that he knew, prior to his accident, that the lawn mower motor and blade would continue to run even when the rider was unseated.

*Id.* at 1223–24.

To like effect *see Williams v. Brasea, Inc.*, 497 F.2d 67, 79 (5th Cir.1974), where it was said:

The question then arises whether the lack of a brake made the winch "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, . . . ." Sec. 402A com. i. This proposition carries its own answer. The danger posed by the lack of a brake could scarcely be beyond the contemplation of crewmen who knew of its absence and worked with the winch in that condition on a daily basis.

With respect to plaintiff's continued insistence that OMC had a duty to warn Tisdale of the need for equipping the boat engine with a kill switch and the possible consequences of his failure to do so the short answer, as we have seen before and as the cited cases hold, is that there was no duty to warn Tisdale of the obvious. He knew about kill switches and the purpose which they served, and had he taken the time to read his instruction book he would have been referred to his dealer for further information on the subject.

Since the evidence has failed to sustain plaintiff's cause of action on strict liability grounds her actions based on negligence and implied warranty must also fail. *Claytor v. General Motors Corporation*, 277 S.C. 259, 286 S.E.2d 129 (1982).

■ Finally, as promised earlier, the court will explain further why it has found it expedient to apply South Carolina law in this case notwithstanding its non-binding force where the court's admiralty jurisdiction has been invoked. In the first place, the parties have not cited and the court's research has not revealed any federal maritime law at variance with the principles of strict liability in tort as applied in South Carolina, and absent some compelling federal authority to the contrary policy considerations argue strongly for applying state law. It was not until the Supreme Court decided *Foremost Insurance Company v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), that it was finally settled that accidents involving pleasure boats on navigable waters fall within the admiralty jurisdiction. Prior thereto there was highly respected opinion in the Fourth Circuit that such cases should not be cognizable in admiralty. *Richards v. Blake Builders Supply, Inc.*, 528 F.2d 745, 747 (4th Cir.1975); *Crosson v. Vance*, 484 F.2d 840 (4th Cir.1973). And, of course, the five to four decision in *Foremost* brought forth the vigorous dissent of Justice Powell concurred in by the Chief Justice, Justice Rehnquist and Justice O'Connor. As pointed out by then Chief Judge Haynsworth in *Crosson v. Vance*, if the accident in this case had resulted in death, the wrongful death statute of South Carolina, not the Death on the High Seas Act, 46 U.S.C. § 761, would have governed. Except for the fortuitous circumstance that the accident here occurred on navigable waters this would have been an essentially local action. For these reasons the court feels that since there are no controlling principles of maritime law mandating a different result, the parties should be bound by South Carolina law the application of which has resulted in the conclusion that plaintiff is not entitled to recover of either of the defendants.

Judgment accordingly will be entered.